JUDGE MCKENNA

10 CV 1542

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WORLD GTL INC. AND<br>WORLD GTL ST. LUCIA LTD., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | 10 Civ. _____ ( ) |
| | ) | |
| -against- | ) | RECEIVED |
| | ) | FEB 23 2010 |
| PETROLEUM COMPANY OF TRINIDAD<br>AND TOBAGO LTD., | ) | COMPLAINT U.S.D.C. S.D. N.Y. CASHIERS |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiffs World GTL Inc. ("**World GTL**") and World GTL of St. Lucia Ltd. ("**WGTL-SL**"), by their attorneys Thompson & Knight LLP, as and for their complaint against Defendant The Petroleum Company of Trinidad and Tobago Ltd. ("**Petrotrin**") allege as follows:

## NATURE OF THE CLAIMS

1.      This action arises out of the wrongful taking and expropriation of a nearly completed gas-to-liquid plant being constructed in The Republic of Trinidad and Tobago ("Trinidad") and physically located within the Petrotrin refinery there.

2.      To maximize the value of its limited supply of natural gas, Trinidad and Petrotrin were eager to have a small to mid sized gas-to-liquid plant. Accordingly, it endeavored to induce Plaintiffs to use and disclose their technology and to invest both time and money to build such a plant. But after having Plaintiffs describe its technology and spend over three years developing and constructing the plant, on the eve of its completion, Petrotrin, with the full knowledge and consent of Trinidad, executed its secret plan to expropriate the plant.

3.    Plaintiffs were co-venturers with Petrotrin in developing this gas-to-liquid facility which was being built with know-how and technology provided by Plaintiffs. These claims arise from the deliberate and duplicitous scheme of Trinidad's wholly-owned agent and instrumentality, Petrotrin, to expropriate Plaintiffs' valuable investment in Trinidad and its valuable technology. Well aware the Plaintiffs would not sell their interest in the gas-to-liquid plant in Trinidad, Defendant developed a stratagem to do by deceit that which it could not achieve openly.

4.    Knowing full well that the construction loan to finance the building of the plant would be in incurable default by July 12, 2009 and that Plaintiffs had another institution ready, willing and able to take out the construction lender, Defendant did all they could to successfully block this new take-out loan and mislead Plaintiffs so as not to timely engage this take-out lender, all the while assuring Plaintiffs that it would pay off the loan, to avoid a default.

5.    Plaintiffs relied on Petrotrin's representations and the assumed good faith of its co-venturer; however, rather than helping its co-venturer secure alternate financing or paying off the loan to avoid a default, without any notice to Plaintiffs, Petrotrin bought the entire loan. Although Petrotrin could have paid off the loan for the face amount of the loan, thus saving the venture from its main creditor, it instead paid a premium to quickly acquire the loan by assignment and become the venture's main creditor.

6.    Having had the loan and its related security agreements assigned to it, Petrotrin then tried to renegotiate its agreements with Plaintiffs so as to take control of the gas-to-liquid facility. When Plaintiffs refused to succumb to Petrotrin's heavy-handed tactics, Petrotrin, using the formidable array of security provisions meant for the protection of the lender--and not for a

co-venturer--had a hand-picked Trinidadian receiver installed who, upon information and belief, at the direction of Petrotrin took over the operations of the facility.  Thus, by buying a $125 million loan--and paying an over $16 million premium to get an assignment of the loan with its stringent security provisions, Defendant acquired 100% of a $500 million plus gas-to-liquid plant, and left Plaintiffs with nothing.

## PARTIES

7.     Plaintiff World GTL is a New York corporation with its principal place of business in New York, New York.  World GTL is in the business of developing, constructing and operating small to medium size gas-to-liquid plants.

8.     Plaintiff WGTL-SL is a corporation established under the laws of St. Lucia with its principal place of business in St. Lucia.  World GTL has over a 95% interest in WGTL-SL.

9.     Defendant Petrotrin is a company incorporated under the laws of Trinidad with its principal place of business at Pointe-a-Pierre, Trinidad.  Petrotrin is wholly owned by Trinidad and operates under the direction of the Ministry of Finance and the Ministry of Energy.

10.     Non-party World GTL Trinidad Ltd. ("**WGTL-Trinidad**") is a company that was jointly established by World GTL (through WGTL-SL) and Petrotrin with its principal place of business at Pointe-a-Pierre, Trinidad.  At all relevant times, WGTL-SL had a 51% ownership interest and Petrotrin had a 49% ownership interest in WGTL-Trinidad.

11.     Non-party Credit Suisse, acting through its Cayman Island Branch ("**Credit Suisse**"), acted as administrative agent and collateral agent for various financial institutions who

were parties to a credit facility providing a construction loan and a term loan to WGTL-Trinidad (the "**Credit Facility**").

## JURISDICTION AND VENUE

12.     Trinidad is a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act, 28 USC § 1602, *et seq.* (the "**FSIA**").  Petrotrin is an agency or instrumentality of a foreign state within the meaning of FSIA.  Pursuant to 28 USC § 1330, this Court has original jurisdiction over an action against an agency or instrumentality of a foreign state without regard to the amount in controversy.

13.     With respect to the acts or omissions here at issue, Petrotrin, at all times, was engaged in a commercial activity within the meaning of FSIA.

14.     In certain of the credit agreements and related security agreements, Petrotrin has waived sovereign immunity and consented to jurisdiction in New York.

15.     Petrotrin transacts business within the State of New York.  Petrotrin has committed tortious acts within this State and has committed a tortious act without the State causing injury within the State.  Petrotrin regularly engages in a persistent course of conduct within the State.

16.     Venue is proper in this district pursuant to 28 USC § 1391(d).

## BACKGROUND

17.     In 2004 the Permanent Secretary of Energy for Trinidad requested World GTL to make a presentation to Trinidad on its capabilities of building a 2,000 barrel a day gas-to-liquid plant.  World GTL was ideally suited to do this as it had the technology to build such a plant

whereas the major refining companies predominantly were interested in building considerably larger plants which were unsuitable for Trinidad as Trinidad did not have sufficient gas reserves to support such a plant.

18.    In May 2004, World GTL and Petrotrin entered into a Memorandum of Understanding to build a gas-to-liquid plant and subsequently on September 22, 2005, Petrotrin and World GTL entered into a Project Agreement for a gas-to-liquid project at Pointe-a-Pierre, Trinidad.

19.    The WGTL-Trinidad facility was to be and was built within Petrotrin's refinery at Pointe-a-Pierre, Trinidad.

20.    WGTL-SL and World GTL were assured that this would be an environmentally safe location.

21.    At the behest of Petrotrin, Credit Suisse was among the financial institutions approached to provide funding, largely because a former Trinidad finance minister was now at Credit Suisse.

22.    Credit Suisse agreed to provide a $125 million Credit Facility and on or about January 12, 2007, World GTL, World GTL-SL, World GTL-Trinidad and Petrotrin entered into certain agreements constituting the Credit Agreement and related security and financing agreements (collectively the "**Credit Agreement**").

23.    The Credit Agreement provided for a construction loan which, after plant completion (as defined in the Credit Agreement) the credit facility would become a non-recourse

term loan. The Credit Suisse loan was jointly and severally guaranteed by Petrotrin and World GTL.

24.      Among other things, the Credit Agreement provided that the facility had to meet certain Lender Reliability Tests prior to July 12, 2009 (the "**Date Certain**"). Failure to meet these requirements by the Date Certain was a Fundamental Event of Default for which there was no cure. Therefore, as of the Date Certain, if the Lender Reliability Tests had not been met the debt was fully matured and payable.

25.      The Lender Reliability Tests, *inter alia*, required that at a point in time prior to July 12, 2009, the facility produce almost 200,000 barrels of gas-to-liquid, of which approximately 150,000 barrels would be gas-to-liquid diesel over a 90 day period. The agreement also required the facility to produce approximately 2,250 barrels per day of gas-to-liquid product during this 90-day period.

26.      In March 2007, shortly after entering into the financing agreement with Credit Suisse, all construction at the WGTL-Trinidad facility had to be suspended for a prolonged period as the result of sulfur emissions from the Petrotrin refinery. These sulfur emissions caused plant evacuations and massive productivity loss and construction delays.

27.      The plant was emitting sulfur dioxide and contaminating the entire facility. Sulfur dioxide is not only a noxious gas, but at moderate levels can be highly irritating to the lungs and air passages and at large levels can be life-threatening.

28.    It was not until August 2007 that Petrotrin presented to the WGTL-Trinidad Board of Directors a plan to correct the sulfur problem and promised to meet emission levels as called for under a draft environmental act of 2005.

29.    Despite Petrotrin's "plan" to correct the sulfur emissions problem, there continued to be episodes of sulfur emission which forced plant evacuations and shut-downs. Indeed, these emissions dramatically increased as the Lender Reliability Tests approached.

30.    These shut-downs and protracted delays were a major cause of massive cost overruns and delays. As a result of Petrotrin being incapable of preventing or unwilling to prevent these numerous and prolonged sulfur emissions resulting in plant evacuations and construction shut-downs, by mid-2008 it was clear that the Lender Reliability Tests were unlikely to be achieved by the Date Certain of July 12, 2009.

31.    Realizing that in large part due to the numerous and prolonged sulfur emissions at Petrotrin's refinery, the Lender Reliability Tests could not be met by the Date Certain of July 12, 2009, World GTL in late 2008 began to explore with Credit Suisse an extension of the Date Certain or finding a new lender to take out the loan from Credit Suisse.

32.    Credit Suisse opposed an amendment unless WGTL-Trinidad took out a new loan for $300 million at a fourteen plus percent interest rate. As the interest rate was excessively high and WGTL-Trinidad did not need $300 million, the WGTL-Trinidad Board of Directors rejected the proposal and approved World GTL seeking other financing.

33.    World GTL met with several financial institutions who were very interested in providing additional financing and taking out Credit Suisse. Barclays Capital (a division of

Barclays Bank PLC) was one such party who was interested in taking out the Credit Suisse loan and providing the additional $100 million that was required to complete the gas-to-liquid facility in Trinidad.

34.    At a meeting held at Petrotrin's facility in Trinidad, Barclays Capital made a presentation of various options that were available to WGTL-Trinidad for additional financing and replacing the Credit Suisse loan.

35.    This meeting was attended by the Petrotrin appointed WGTL-Trinidad board members, Ken Allum, Charmaine Baptiste and Kevin Singh.   Ms. Baptiste, who is also Chairman of Petrotrin's finance committee, chose an option that would likely be balance sheet neutral to Petrotrin.

36.    After having made the choice as to how to proceed with the financing, WGTL-Trinidad and Barclays Capital entered into an exclusive agreement by which Barclays Capital was to go forward in terms of preparing the necessary documentation.  In the coming months, WGTL-Trinidad incurred in excess of $900,000 in legal, accounting and other professional fees in furtherance of this transaction.  This expenditure was subsequently approved by the WGTL-Trinidad board at a board meeting held on August 17, 2009.

37.    At a meeting of the WGTL-Trinidad board on May 27, 2009, the latest Barclays Capital term sheet was presented and found acceptable and a closing date for refinancing with Barclays Capital was scheduled for July 6, 2009.

38.    Also at this meeting, Credit Suisse's demand for a "make-whole" premium as part of being taken out was unanimously rejected by the board.

39.    By at least May 27, 2009, Barclays Capital was willing to underwrite a $225 million, 9.12% long-term bond issue.

40.    During the period of time that Barclays was preparing to offer this bond issue, Petrotrin was also seeking to do its own bond offering for $850 million to upgrade its refinery.

41.    As the Barclays Capital transaction got closer to fruition, the Petrotrin board members started to raise obstacles to the Barclays Capital bond offering arguing that they were told by their investment bankers that the WGTL-Trinidad bond offering would adversely impact their ability to raise $850 million through their own bond offering.

42.    The Petrotrin-appointed board members of WGTL-Trinidad therefore requested that WGTL-Trinidad delay its bond offering until Petrotrin had closed on its $850 million bond offering.  The World GTL-appointed board members expressed concern over the fact that the Lender's Reliability Tests could not be met and that a delay would mean that on the Date Certain there would be a Fundamental Event of Default under the Credit Suisse Credit Agreement.

43.    This issue was squarely addressed at the June 29, 2009 WGTL-Trinidad board meeting.

44.    Kevin Singh, a Petrotrin-appointed board member, told the World GTL-appointed board members not to worry about the Date Certain and not being able to meet the Lender Reliability Tests by that date as Petrotrin would pay off the loan, not let it go into default and the Barclays Capital bond offering could go forward after the Petrotrin Bond Offering closed.

45.    Never did any Petrotrin-appointed WGTL-Trinidad board member indicate that Petrotrin intended to buy the loan nor did they invite Plaintiffs to participate in acquiring the loan

as, upon information and belief, Petrotrin clearly wanted to use its acquisition of the loan to expropriate the gas-to-liquid facility.

46.     In reliance on these representations, World GTL and WGTL-SL put the Barclays Capital transaction on hold and did not pursue other sources of financing pending the closing of Petrotrin's bond offering including Goldman Sachs, who also could have taken out the Credit Suisse loan.

47.     On information and belief, at the time these representations were made, Petrotrin was negotiating with Credit Suisse not to pay off the loan at its face amount, but rather to quickly acquire the loan by assignment by paying a premium.

48.     Although Petrotrin could have paid off the loan for its face amount, Petrotrin instead was willing to make a "make-whole" payment of an additional $16.2 million to acquire the loan by assignment and purportedly stand in the shoes of Credit Suisse. On July 7, 2009, the effective date on which Petrotrin bought the loan and had the Credit Agreement assigned to it, Petrotrin was fully aware that the Lender Reliability Tests were impossible to meet by the July 12, 2009 Date Certain.

49.     Upon information and belief, the sole reason for Petrotrin not paying off, but instead buying, the Credit Suisse loan and taking an assignment of it and the Credit Agreement, was to take over the WGTL-Trinidad facility.

50.     The facility is worth in excess of $500 million. Petrotrin was able to acquire the entire facility by paying off the Credit Suisse loan, which it had jointly and severally guaranteed, and making a $16.2 million "make-whole" payment.

51.    On the same day as the effective date of the assignment, there was a meeting held at the Hyatt Regency Hotel in Port of Spain, Trinidad among Malcolm Jones, then Executive Chairman of Petrotrin, and David Loring, Executive Chairman of WGTL-Trinidad and Chairman of World GTL, to discuss a restructuring of the gas-to-liquid project which restructuring, *inter alia*, would have the effect of transferring control of WGTL-Trinidad to Petrotrin.

52.    While the negotiations were continuing, there were additional massive sulfur emission episodes of intensities more than four times greater than previously recorded. One worker was evacuated on August 13 and died about 10 days later with the cause of death in the autopsy report listed as "acute respiratory distress syndrome due to toxic fumes inhalation." Three government investigations followed: (i) one by the Ministry of Energy; (ii) another by the OSH [a worker's safety unit similar of OSHA in the US]; and (iii) a homicide investigation by the San Fernando Police Department. The World GTL-appointed Executive Chairman of WGTL Trinidad then called for a "Unanimous Consent Resolution" by the WGTL Trinidad Board of Directors to set up an independent committee of the board, as a matter of good corporate governance, to manage the three sulfur-related investigations. None of the Petrotrin-appointed Directors signed the Resolution. This emission episode stopped all plant activity.

53.    For more than two months, World GTL and WGTL-SL negotiated with Petrotrin over the possibility of restructuring WGTL-Trinidad. It became clear during these negotiations that Petrotrin wanted total control even to the extent of not being willing to enter into a viable management agreement with World GTL, who had been managing the construction of the project since its inception.

54.    Having purchased and taken assignment of the Credit Suisse loan facility on July 7, 2009, Petrotrin knew full well that a non-curable Fundamental Event of Default would occur on July 12, 2009, as it was impossible for the Lender Reliability Tests to be met.  Clearly, Petrotrin's acquisition of the Credit Suisse loan was intended to -- and did -- put a gun to the head of World GTL and WGTL-SL to wrest control of the gas-to-liquid plant from them.

55.    On September 25, 2009, Petrotrin, acting in the shoes of Credit Suisse, appointed its hand-picked receiver for WGTL-Trinidad who took total control of the facility without notice to anyone and without any judicial proceeding

56.    Upon his appointment, the receiver took complete charge of WGTL-Trinidad and the plant.  He has excluded World GTL from all management roles and closed its access to the computer network causing WGTL-Trinidad to breach the service contract between it and World GTL.

57.    At the time the receiver took over WGTL-Trinidad, the construction had been stopped for almost 1 ½ months as a result of the high-level of sulfur dioxide emissions at the Petrotrin plant.

58.    Although these emissions had been on-going for over a month reaching very high and unsafe levels, miraculously once the receiver took over the sulfur emissions ceased such that the receiver could order everyone back to work within a week of his taking over.

59.    Petrotrin, through its hand-picked receiver, now has seen its stratagem work as it has effectively misappropriated and expropriated Plaintiffs' investment in WGTL-Trinidad and the gas-to-liquid plant at Pointe-a-Pierre.

60.    From the inception of the Trinidad gas-to-liquid project, it was understood by Petrotrin that the Trinidad plant was to be a showcase small to mid-size gas-to-liquid facility for World GTL.

61.    It was further understood that based on this showcase, World GTL intended an initial public offering to, among other things,  raise capital to build additional such facilities throughout the world.  To this end, it had retained certain investment bankers to value a World GTL enterprise.  In November 2007, the renowned banking firm Calyon, based on various analyses, valued the World GTL enterprise in excess of $2 billion.

62.    With Defendant's successful scheme to take over WGTL-Trinidad, this value has been destroyed.

### AS AND FOR A FIRST CLAIM
### (FRAUD)

63.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64.    As of at least late 2008, or January 2009, the parties knew that the Lender's Reliability Test could not be met by the Date Certain, July 12, 2009.

65.    Realizing that a Fundamental Event of Default would exist as of July 12, 2009 and that the loan would mature and be fully payable on that date, World GTL sought to either extend the Date Certain or to find another financial institution that would take out Credit Suisse and provide additional financing and a later Date Certain.

66.    As Credit Suisse would only extend the Date Certain on onerous terms, World GTL sought other financing.  Barclays Capital proposed a transaction which was ultimately acceptable to the WGTL-Trinidad board.

67.    The WGTL-Trinidad board had unanimously agreed to proceed with the Barclays Capital proposal.  The Petrotrin-appointed directors continuously said they were in favor of consummating a transaction with Barclays Capital; nonetheless they continually set up road blocks to having the Barclays Capital transaction come to fruition.

68.    One major reason espoused by Petrotin to delay closing the Barclays Capital funding was a claimed adverse effect it would have on Petrotrin's balance sheet.  This position had been articulated at a WGTL-Trinidad board meeting held on May 27, 2009 by Petrotrin-appointed director (and Chair of Petrotrin's finance committee), Charmaine Baptiste.

69.    Upon information and belief, the purported reasons for delaying the Barclays Capital financing past the Date Certain were false and known to be false when made.

70.    There would be no adverse effect on Petrotrin's bond offering.  Indeed, when it went to market in August 2009, the bond offering was massively over-subscribed.

71.    Plaintiffs relied on these representations by neither arranging for the closing of the Barclays Capital transaction (on either the terms previously approved or upon such other terms in the event Petrotrin was obdurate) or obtaining financing from Goldman Sachs, who was eager to do such a transaction.

72.    At a WGTL-Trinidad board meeting held on June 29, 2009 with all board members in attendance, the World GTL-appointed directors were very concerned about the

impending Date Certain and the Credit Suisse loan becoming due and payable. Director Kevin Singh, a Petrotrin-appointed director, stated that Petrotrin would not allow the Credit Suisse loan to go into default and that Petrotrin would pay off the loan.

73.    Upon information and belief, these representations were false and were known to be false when made as Petrotrin was already in negotiations with Credit Suisse to take the loan by assignment (which it did eight days later), so that it could take over WGTL-Trinidad and the gas-to-liquid plant.

74.    As a result of relying on these false representations, World GTL and WGTL-SL were deprived of their interest in WGTL-Trinidad and the gas-to-liquid plant.

75.    By reason of the foregoing, Defendant is liable to the Plaintiffs an amount to be determined by at trial, but in no event less than $2 billion.

## AS AND FOR A SECOND CLAIM
## (NEGLIGENT MISREPRESENTATION)

76.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.    With the exercise of due care, the Petrotrin-appointed directors should have known that their representations set forth above were false and that Plaintiffs would rely upon them.

78.    Plaintiffs did in fact rely upon them to their detriment.

79.    By reason of Defendants' negligent misrepresentations, Plaintiffs have been injured in an amount to be determined at trial, but in no event less than $2 billion.

## AS AND FOR A THIRD CLAIM
### (BREACH OF CONTRACT AND BREACH OF THE
### COVENANT OF GOOD FAITH AND FAIR DEALING)

80.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.    On January 19, 2006, WGTL-SL, WGTL-Trinidad and Petrotrin entered into a shareholders' agreement.

82.    The shareholders' agreement provided in pertinent part that four of the seven directors on WGTL-Trinidad's board would be appointed by World GTL and, with certain exceptions, would have the votes necessary for most decisions.

83.    Accordingly, pursuant to paragraph 6(b), the parties agreed that:

> Each of the Shareholders shall exercise all voting rights and other powers of control available to them in relation to WGTL-Trinidad so as to procure . . . that at all times during the term of this agreement the provisions concerning the structure and organization of WGTL-Trinidad and the regulation of its affairs set out in this agreement are duly observed and given a full force and effect and all actions required of the parties under this agreement are carried out in a timely manner.

84.    Petrotrin breached this agreement and its duty of good faith and fair dealing by refusing to approve the transaction with Barclays Capital, a transaction which would have been in the best interest of Petrotrin, World GTL, WGTL-SL and WGTL-Trinidad and maintained the management structure as it had existed.  Instead, Petrotrin acted to further its own interests and advance its scheme of taking control of WGTL-Trinidad.

85.    As a result of these acts, Defendant succeeded in its scheme to take over WGTL-Trinidad and the gas-to-liquid plant for its benefit and to the detriment of Plaintiffs.

86.    By reason of the foregoing, Defendant is liable to the Plaintiffs in an amount to be determined at trial, but in no event less than $250 million.

## AS AND FOR A FOURTH CLAIM
## (UNJUST ENRICHMENT)

87.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88.    Through the subterfuges alleged above, Petrotrin effectively precluded World GTL and WGTL-SL from having another financial institution take out the Credit Suisse loan and avoiding the inevitable Fundamental Event of Default on the Date Certain.

89.    Defendant acquired Credit Suisse's position by buying the loan from Credit Suisse for the amount of the debt (which it had jointly and severally guaranteed) and was paying the make-whole payment of $16.2 million – a payment which was not called for under the credit agreement. Then, standing in the shoes of Credit Suisse, Petrotrin essentially took over WGTL-Trinidad completely.

90.    WGTL-Trinidad had previously been valued at in excess of $500 million.

91.    As a result, Defendant has been unjustly enriched at the expense of Plaintiffs and it would be against equity and good conscience to not require Defendants to make restitution.

92.    By reason of the foregoing, Defendant is liable to Plaintiffs in an amount to be determined at trial, but in no event less than $250 million.

## AS AND FOR A FIFTH CLAIM
### (NEGLIGENCE)

93.     Plaintiffs repeat and reallege the allegations of paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     The gas-to-liquid plant is being built within Petrotrin's refinery at Point-a-Pierre in an area Petrotrin said was environmentally safe.

95.     Petrotrin is responsible for the safe operation of its refinery.

96.     Commencing in March 2007, the refinery spewed sulfur dioxide, contaminating the air in the refinery and plant facility.

97.     These sulfur emissions continued intermittently until today and upon information and belief result from Petrotrin's negligence in operating and/or maintaining its refinery.

98.     A foreseeable consequence of negligently allowing these sulfur dioxide emissions was delay and cost overruns in the construction of the gas-to-liquid plant.

99.     One proximate consequence of these sulfur dioxide emissions and resulting delays was increased costs and the inability to meet the Lender Reliability Test by the Date Certain.

100.    Indeed for the period after Petrotrin took the Credit Suisse loan by assignment as a result of the sulfur omissions, the plant had to be closed for prolonged periods of time until its puppet receiver was appointed.

101.    These delays precluded timely meeting the Lender Reliability Test.  In addition to facilitating Defendant's expropriation of WGTL-Trinidad, it resulted in the destruction in the value of World GTL.

102.    By reason of the Defendant's negligence, Plaintiffs have been injured in an amount to be determined at trial, but in no event less than $2 billion.

## AS AND FOR A SIXTH CLAIM
### (EXPROPRIATION)

103.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 102 of this Complaint as if fully set forth herein.

104.    World GTL and WGTL-Trinidad had entered into a service agreement effective September 22, 2005 (the "**Service Agreement**") whereby WGTL-Trinidad agreed to acquire the provision of various services from World GTL. This interest and this investment has since been rendered valueless and therefore expropriated by Defendant.

105.    No compensation has been paid for the taking of this investment.

106.    By reasons of the foregoing, Defendant is liable to Plaintiffs in an amount to be determined at trial, but in no event less than $2 million.

WHEREFORE, Plaintiffs demand judgment against Defendant as follows:

A.    On the first claim, an amount to be determined at trial, but in no event less than $2 billion;

B.    On the second claim, an amount to be determined at trial, but in no event less than $2 billion;

C.    On the third claim, an amount to be determined at trial, but in no event less than $250 million;

D.    On the fourth claim, an amount to be determined at trial, but in no event less than $250 million;

E.    On the fifth claim, an amount to be determined at trial, but in no event less than $2 billion;

F.    On the sixth claim, an amount to be determined at trial, but in no event less than $2 million;

G.    Interest, the costs associated with this litigation, and attorneys fees; and

H.    Such other and further relief as is just.

Dated: New York, New York
      February 23, 2010

THOMPSON & KNIGHT LLP

By: _____
      Robert F. Brodegaard (RB-7093)
      Brian C. Dunning (BD-1163)
      919 Third Avenue
      39th Floor
      New York, New York 10022
      (212) 751-3001

      *Attorneys for Plaintiffs*
      World GTL Inc. and
      World GTL St. Lucia Ltd.